246 P.3d 746 (2011)
240 Or. App. 403
Kipland Philip KINKEL, Petitioner-Appellant,
v.
Gary LAWHEAD, Superintendent, MacLaren Youth Correctional Facility, Defendant-Respondent.
03C21079; A137866.
Court of Appeals of Oregon.
Argued and Submitted July 15, 2010.
Decided January 12, 2011.
*747 Dennis N. Balske, Portland, argued the cause for appellant. With him on the briefs was Lawrence Matasar.
Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before ORTEGA, Presiding Judge, and SERCOMBE, Judge, and LANDAU, Judge pro tempore.
LANDAU, J., Pro Tempore.
Petitioner was charged with a number of counts of aggravated murder and attempted aggravated murder arising out of incidents in which he shot and killed his parents and, the following day, fired semi-automatic weapons while at his high school, killing two and injuring nearly two dozen students. He was given court-appointed counsel, who negotiated a plea agreement to which petitioner ultimately agreed. The criminal trial court entered judgment in accordance with the agreement and sentenced defendant to over 100 years' imprisonment.
Petitioner later initiated this action for post-conviction relief, requesting that the judgment of conviction be set aside and the sentences vacated. In support of that request, petitioner contends that, among other things, he had received constitutionally inadequate assistance of counsel during the plea negotiations, that his acceptance of the plea agreement was not knowing and voluntary, and that the plea agreement should not have been accepted without the consent of his guardian ad litem. The post-conviction court denied relief, concluding that petitioner received adequate assistance of counsel, that his plea was voluntary, and that the approval of the guardian ad litem was not required by law. Petitioner appeals, assigning error to each of the foregoing rulings. We conclude that the post-conviction court did not err and affirm.
The relevant facts are not in dispute. Petitioner's convictions arise from the murder of his parents and a subsequent shooting rampage at Thurston High School in Springfield in May 1998, when petitioner was 15 years old. Petitioner was indicted on four counts of aggravated murder, 25 counts of attempted aggravated murder with a firearm, one count of attempted aggravated murder, six counts of assault in the first degree with a firearm, 18 counts of assault in *748 the second degree with a firearm, and other felony offenses, for a total of 58 criminal charges. The trial court appointed Mark Sabitt and Richard Mullen to represent petitioner. Sabitt and Mullen had, respectively, 10 and 23 years' previous experience in representing criminal defendants. Both also were experienced in dealing with clients who were mentally ill and whose legal competence was in question.
Sabitt and Mullen asserted a defense of guilty except for insanity. ORS 161.295. Over the course of the following year, they arranged to have petitioner submit to more than a dozen mental health evaluations, including psychological, psychiatric, and neurological evaluations. Among the examining experts were a child psychologist, Dr. Orin Bolstad, and psychiatrist, Dr. William Sack. Bolstad opined that, because of petitioner's age, it was too early to give an exact diagnosis, but that it was clear that petitioner had a psychotic disorder, most likely paranoid schizophrenia or a schizo-affective disorder, with symptoms that included auditory hallucinations and severe depression. The other psychiatric and psychological experts retained by the defense agreed. Based upon the recommendations of Bolstad and others, petitioner began taking antipsychotic medications.
Because petitioner was a minor, Sabitt and Mullen asked the court to appoint a guardian ad litem to facilitate the release of medical and school records that could be released only with the consent of a parent or guardian. The court appointed petitioner's aunt, Claudia Jurowski.
The state asked for permission to examine petitioner. In response, on July 2, 1999, Sabitt and Mullen instructed petitioner to stop taking his antipsychotic medications. Jail records indicate that between July 1999 and September 1999, petitioner's symptomsauditory hallucinations and severe depressionbecame more intense due to the withdrawal of the antipsychotic medications and the stress of the impending trial. Petitioner resumed taking his antipsychotic medications on September 21, 1999.
In the meantime, defense counsel and the state pursued plea negotiations. On September 23, 1999, the parties participated in a mediated settlement conference. Although petitioner was not present at the settlement conference, Sabitt and Mullen had access to him at the jail and updated him throughout the settlement conference. Petitioner's guardian ad litem was also present to consult with petitioner.
The mediation produced a potential settlement that involved pleading guilty to various lesser offenses, and for dismissal of some of the charges, which Sabitt and Mullen explained to petitioner. Under the terms of that proposal, petitioner would plead guilty to four counts of murder, for which he would receive concurrent 25-year sentences, and he would plead guilty to 25 counts of attempted murder and no contest to an additional count of attempted murder, for which he would receive sentences that remained up to the court. Petitioner agreed.
The following day, on September 24, 1999, petitioner pleaded guilty to four counts of murder and 25 counts of attempted murder, and pleaded no contest to one count of attempted murder. During the plea colloquy, the criminal trial court recited each paragraph of the plea agreement and asked petitioner if it was correct and if he had initialed each paragraph. To every question, petitioner responded in the affirmative. The court asked petitioner whether he understood the process by which the agreement was reached and the reasons for electing to accept the agreement rather than proceed to trial. Petitioner again responded in the affirmative. Jurowski, petitioner's guardian ad litem, was in attendance as the trial court reviewed the terms of the plea agreement with petitioner. A lengthy sentencing hearing followed, the details of which are not pertinent to the issues in this post-conviction proceeding. After the sentencing hearing, the criminal trial court sentenced petitioner to a total of 111 years and eight months' imprisonment. Petitioner challenged the lawfulness of those sentences on direct appeal on the ground that, among other things, they were unconstitutionally cruel and unusual; we upheld the constitutionality of the sentences. State v. Kinkel, 184 Or.App. 277, 56 P.3d 463, rev. den., 335 Or. 142, 61 P.3d 938 (2002).
*749 Petitioner then filed a petition for post-conviction relief based on multiple claims of constitutionally inadequate assistance of counsel and of criminal trial court error. Four of those grounds are pertinent to this appeal.
First, petitioner alleged that he was denied adequate and effective assistance of criminal trial counsel under the state and federal constitutions because Sabitt and Mullen failed to request a mental examination to determine petitioner's competency prior to petitioner's acceptance of the plea agreement and his entry of guilty pleas. Petitioner contended that both Sabitt and Mullen were aware that, as a result of petitioner not taking his antipsychotic medications during the three months preceding the settlement conference, petitioner's auditory hallucinations and anxiety had significantly increased, making it possible that he was incompetent and, thereby, unable to accept the plea agreement. Because of that knowledge, petitioner contended, Sabitt and Mullen should have requested a competency examination, and their failure to do so was a failure to exercise reasonable professional skill and judgment and resulted in petitioner suffering prejudice. In support of that contention, petitioner relied on the testimony of Bolstad and Sack, who opined that, in retrospect, in light of petitioner's diagnosis, his behavior, and the fact that he had returned to taking his medication only shortly before the plea negotiations, it is unlikely that he was competent at that time.
Second, petitioner alleged that he also was denied adequate and effective assistance of criminal trial counsel under the state and federal constitutions because Sabitt and Mullen failed to obtain the consent of petitioner's guardian ad litem to the plea agreement. Petitioner contended that, if Sabitt and Mullen had done so, Jurowski, petitioner's guardian ad litem, would not have approved the agreement.
Third, and in a related vein, petitioner alleged that the criminal trial court erred by accepting petitioner's plea agreement and his waiver of his constitutional rights without his guardian ad litem's consent. To accept the plea agreement without her consent, petitioner argues, was a violation of his procedural rights under both the state and federal constitutions.
Last, petitioner alleged that he was denied due process under the Fourteenth Amendment to the United States Constitution and deprived of various state constitutional guarantees because his waiver of his constitutional rights by pleading guilty was not voluntary. Again, petitioner asserted that, because he had not been using antipsychotic medications in the weeks before the negotiation of the plea agreement, he did not have the ability to waive his constitutional rights. According to petitioner, his waiver of rights was involuntary because it was motivated by his irrational fears of appearing in court, exposing his mental illness to the world, and being sent to the state mental hospital, and because it would satisfy the voices in his head that became unbearable to petitioner during stressful situations.
The state responded that Sabitt and Mullen provided constitutionally adequate representation. With respect to the decision not to request a competency examination, the state relied on, among other things, the testimony of both lawyers that no such examination was necessary. As Sabitt later explained:
"I never had any real concerns about [petitioner's] ability to aid and assist, he clearly understood the court process and my role in the case and our objective in defending the case, and he was able to assist me throughout most of the time that we had a relationship with those objectives[.]"
Although he did not ask for a formal aid and assist evaluation, Sabitt stated, "I recall speaking with Dr. Bolstad about that, and * * * Dr. Bolstad was clear that he didn't see any aid and assist problems * * *." Sabitt further explained that the other physicians also did not express concerns to him about petitioner's ability to aid and assist in his defense.
Mullen similarly recalled that, "when I met with [petitioner] he seemed to be calm, he seemed to understand the conversation we were having. Uh, I don't think I ever saw *750 him distraught after that, not significantly distraught after that till the change of plea." Mullen stated that, at no time during his representation of petitioner did he think "that [petitioner] did not understand the proceedings and what was going on." To the contrary, he explained, he met with petitioner's doctors, including Bolstad, about just that issue and that "there seemed to be universal agreement that [petitioner's competency] wasn't an issue."
The state also relied on evidence that both the prosecutor and the criminal court were of the opinion that petitioner was legally competent. In particular, the state noted the lengthy and thorough hearing at which the trial court went through the plea agreement with petitioner paragraph by paragraph, questioning him about his understanding of its terms and the process by which it was reached. The state further noted that the record of petitioner's own behavior demonstrated his competency, both when he was on his antipsychotic medication and when he was not.
As for petitioner's contention that the plea agreement was not valid because it was not approved by the guardian ad litem, the state responded that no Oregon law requires such approval and that the only reason for the appointment of the guardian ad litem was to facilitate the production of certain medical and school records that could not be released without the permission of a parent or guardian.
Finally, in response to petitioner's claim that his plea was not voluntary, the state relied on the foregoing evidence that, to the contrary, petitioner was well aware of the nature and significance of his decision.
After a two-day trial, the post-conviction court denied the relief that petitioner requested, rejecting each of the grounds that he had alleged in his petition. The post-conviction court explained its decision in an order that included extensive findings of fact, several of which are relevant to this appeal. The court found:
"20. [Dr. Bolstad and Dr. Sack] based their opinion of whether petitioner could aid and assist at the time he entered his plea on the fact that petitioner was taken off his medication three months prior to his guilty plea and the fact that they believe the records of petitioner's treating doctor indicate that petitioner was mentally de-compensating prior to entering his plea.
"21. Dr. Bolstad and Dr. Sack's determinations that petitioner was not mentally competent when he entered his pleas constitute theories that were contradicted by the weight of the evidence presented to the court.
"22. The mere fact that a person suffers from a mental disease or defect does not make them incompetent to aid and assist their attorneys.
"23. Prior to entering his pleas, petitioner was seen fourteen times by seven different mental health professionals, for the purpose of rendering an evaluation on a potential insanity defense. Throughout most of the defense evaluations, petitioner was not taking any psychotropic medication, at Dr. Bolstad's specific request.
"24. It would have been professionally incumbent on mental health professionals to raise an aid and assist issue to trial counsel if they saw indications that one may be present.
"25. None of the mental health professionals that evaluated petitioner indicated to anyoneincluding petitioner's trial counselthat petitioner was not mentally competent and therefore could not aid and assist. This includes the two mental health professionals that evaluated petitioner closest in time to his pleas. Those who did comment on petitioner's competency, including Dr. Bolstad, opined to trial counsel that petitioner was legally competent.
"* * * * *
"33. Trial counsel had no indications whatsoever that petitioner was unable to aid and assist them and fully participate in the entry of his guilty pleas. If either attorney had seen any evidence whatsoever pointing to petitioner's inability to proceed, they would have conducted a competency evaluation on their own or asked the court to order one.

*751 "34. Petitioner's guilty plea was entered after a lengthy plea colloquy with Judge Mattison. During petitioner's colloquy, Judge Mattison found petitioner to be competent to proceed with entering his guilty pleas. He also believed that there was no evidence that would have caused him to suspect [petitioner] was incompetent to stand trial, unable to aid and assist in his own defense, unfit to proceed by reason of incapacity due to mental disease or defect, unable to understand the nature of the proceedings, unable to assist and cooperate with counsel, or unable to participate in his own defense. * * *
"35. During petitioner's deposition, petitioner indicated that he understood the plea process. He was able to clearly recall and understand the nature of the pleas he entered and the reasons why he and his attorneys chose to go the `plea route' rather than proceed to trial."
On appeal, petitioner advances essentially three arguments: (1) the court erred in concluding that petitioner received adequate assistance of counsel, because "Its Key Factual Holding is Not Supported by the Record" and because the court "Disregard[ed] Highly Relevant Evidence" and controlling law (capitals in original; boldface omitted); (2) the court erred in concluding that petitioner's plea was voluntary; and (3) the court erred in concluding that petitioner's plea was not void in the absence of the consent of his guardian ad litem. We address each of those arguments in turn.
We begin with petitioner's claim of inadequate assistance. To prevail on a post-conviction claim for inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, a petitioner must prove, by a preponderance of the evidence, facts demonstrating that counsel failed to exercise reasonable professional skill and judgment and that the petitioner suffered prejudice as a result. Trujillo v. Maass, 312 Or. 431, 435, 822 P.2d 703 (1991). To prevail under the Sixth Amendment to the United States Constitution, a petitioner must prove that counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On appeal from a judgment dismissing a post-conviction petition, our review
"is limited to determining whether there is any evidence in the record to support the post-conviction court's findings. Ball v. Gladden, 250 Or. 485, 443 P.2d 621 (1968). Under that standard of review, we do not reweigh the evidence or speculate whether the evidence might have supported other factual findings than those made by the trial court. We simply determine whether any evidence does support the findings of the trial court[.]"
Pratt v. Armenakis, 201 Or.App. 217, 220, 118 P.3d 821 (2005), rev. den., 340 Or. 483, 135 P.3d 318 (2006) (emphasis in original). We otherwise review the post-conviction court's decision for errors of law. Chew v. State of Oregon, 121 Or.App. 474, 476, 855 P.2d 1120, rev. den., 318 Or. 24, 862 P.2d 1304 (1993).
In this case, as we have noted, petitioner contends that criminal trial counsel failed to exercise reasonable professional skill in failing to request a competency determination and, on appeal, contends that the post-conviction court erred in rejecting his claim. Specifically, petitioner argues that the post-conviction court ignored evidence "clearly demonstrating" that, after criminal trial counsel withdrew petitioner's medications in preparation for a mental health examination by the state, his condition had deteriorated to an extent that obviously rendered him incapable of making an intelligent decision about the proposed plea agreement. In petitioner's view, his mental condition during the time of the plea negotiations was such that minimally adequate counsel would have asked for a competency determination to ensure that petitioner was capable of making the decision whether to accept the plea.
Petitioner's contentions, however, simply cannot be reconciled with the demanding standard of review that applies to his assignment of error. He contends that *752 the post-conviction court's findings are contradicted by the weight of the evidence. In particular, petitioner takes issue with the court's finding that criminal trial counsel had "no indications" that petitioner was unable to aid and assist. Petitioner insists that the court's finding "is contrary to the record, where there are multiple indications * * * suggesting that petitioner was unable to aid and assist." The problem is that, even if petitioner were correct about that, the fact that the court's factual finding was contradicted by other evidence in the record is beside the point. The determinative question on an appeal from a judgment dismissing a petition for post-conviction relief is whether there is any evidence in the record that supports the court's finding. Pratt, 201 Or.App. at 220, 118 P.3d 821.
In this case, there clearly was such evidence. As we have noted, the record shows that Sabitt and Mullen testified that they had no indication that petitioner was not competent, that petitioner "understood the process," that he was "able to assist" throughout the proceeding, that they had even discussed petitioner's competency with the expert witnessesincluding Bolstad and that there was "universal agreement" among those experts that petitioner's competency "wasn't an issue." Given that evidence, we cannot say that the finding that petitioner challenges was not supported by any evidence. We therefore must conclude that the trial court did not err in rejecting petitioner's inadequacy of counsel claim.
We turn to petitioner's claim that his acceptance of the plea was not knowing and voluntary and, in consequence, a denial of due process. A guilty plea is voluntary for purposes of due process if entered by one who is fully aware of the direct consequences without being induced by fraud or improper threats. Brady v. United States, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In reviewing a post-conviction court's determination that a plea was knowing and voluntary, we are bound by the court's findings of fact if there is any evidence in the record to support them and, on the basis of those findings of fact, determine whether, as a matter of law, the court erred in determining that the plea was valid. Miotke v. Gladden, 250 Or. 466, 468, 443 P.2d 617 (1968) ("We could reverse [on the ground that a confession was not voluntary] only if we found as a matter of law from all the circumstances, including the facts as found by the trial court, that there had been a substantial denial of petitioner's rights * * *."); Wilson v. Armenakis, 144 Or.App. 587, 589, 928 P.2d 354 (1996), rev. den, 324 Or. 560, 931 P.2d 99 (1997) (rejecting the post-conviction petitioner's claim that a plea was not knowing and voluntary based on findings of post-conviction court that the "petitioner executed a plea petition that set out the rights that he was waiving, that trial counsel read the petition to petitioner before he entered his guilty plea, and that, before accepting the plea, the trial court assured itself that petitioner's plea was knowing, voluntary and intelligent" (footnote omitted)).
In this case, the post-conviction court found as fact that petitioner understood the nature of his plea agreement, noting that among other thingsthe sentencing court engaged in a thorough examination of petitioner and determined that petitioner knew what he was doing and that petitioner himself indicated that he clearly understood the plea process and was clearly able to recall and understand the nature of the pleas that he entered and the reasons why he and his lawyers decided to choose a plea agreement over going to trial.
On appeal, petitioner does not contest that there is evidence to support the post-conviction court's findings. Nor does he suggest that his plea was induced by fraud or improper threats. Rather, as in his first assignment of error, he contends that other evidence in the record indicates that petitioner's plea "was a product of his severe mental illness[.]" In particular, petitioner relies on the fact that Bolstad, in retrospect, doubted that petitioner was capable of making such a decision in light of his poor mental health. Again, however, as in petitioner's first assignment of error, petitioner's contentions founder against our standard of review. The post-conviction court found that petitioner's condition, in fact, did not interfere with his ability to make a knowing and voluntary *753 decision. As we have noted, there was evidence to support that finding. Given the trial court's findings, we cannot say that, as a matter of law, petitioner's plea was not knowing and voluntary.
Finally, we address petitioner's claims concerning the failure of criminal trial counsel to seek the approval of petitioner's guardian ad litem before accepting the plea agreement. As we have noted, petitioner argues that the post-conviction court erred in holding that petitioner was not denied effective assistance of counsel when Sabitt and Mullen failed to obtain his guardian ad litem's consent to the plea agreement and that petitioner was not denied due process when the criminal trial court accepted petitioner's plea without the consent of his guardian ad litem.
The right to waive the right to a jury trial and accept a plea bargain is personal to a criminal defendant. State v. Jackson, 178 Or.App. 233, 236, 36 P.3d 500 (2001); see also ORS 135.425(1) ("Defense counsel shall conclude a plea agreement only with the consent of the defendant, and shall insure that the decision whether to enter a plea of guilty or no contest is ultimately made by the defendant."). It is well established in Oregon that a juvenile possesses such a right, so long as the exercise of that right is knowing and voluntary. See State ex rel. Juv. Dept. v. Welch, 12 Or.App. 400, 408, 501 P.2d 991, 507 P.2d 401, rev. den. (1973) ("[A] juvenile can waive his [or her] constitutional rights if the waiver is knowingly, understandingly, and voluntarily made."). Appointment of a guardian ad litem for the defendant, such as the one in this case, does not require the alteration of that established principle.
In this case, the trial court appointed petitioner's aunt, Jurowski, to be petitioner's guardian ad litem not because he was incompetent or incapacitated, but for the sole purpose of allowing his criminal trial counsel to obtain access to certain medical and school records that, because petitioner was a minor, could not be released without the consent of a parent or guardian. The issue before us, then, is whether the appointment of Jurowski for that limited purpose had the effect of eliminating petitioner's capacity to make decisions about the waiver of his constitutional rights and the acceptance of a plea in a criminal case.
The only authority that petitioner cites in support of his contention that the appointment of Jurowski had precisely that effect is a termination of parental rights decision, State ex rel. Dept. of Human Services v. Sumpter, 201 Or.App. 79, 116 P.3d 942 (2005). According to petitioner, Sumpter stands for the broad proposition that, "where a guardian ad litem is appointed for a party, the guardian herself must formally waive the party's constitutional rights." (Emphasis in original.)
Petitioner reads too much into Sumpter and, indeed, ignores its rationale. In that case, the issue was whether the mother waived her right to a trial on the state's petition to terminate her parental rights. Id. at 84, 116 P.3d 942. The juvenile court had appointed for the mother a guardian ad litem. Following some negotiations with the state, the parties appeared before the court, and the state represented that the parties had agreed to termination of the mother's rights without a trial. Id. at 81-83, 116 P.3d 942. The guardian ad litem was present, but she did not object. Id. at 83, 116 P.3d 942. Following the termination of the mother's parental rights, she appealed, arguing that there had been no valid waiver of her right to a trial. This court concluded that, once the juvenile court appointed the guardian ad litem, her consent was required for the waiver of trial to be valid. Id. at 85, 116 P.3d 942. That is so, we explained, because the function of appointing a guardian ad litem in parental termination cases is precisely to represent the interests of a person without capacity to make decisions for herself. Id. We cited in support of that explanation an earlier decision, State ex rel. Juv. Dept. v. Cooper, 188 Or.App. 588, 597-98, 72 P.3d 674 (2003), in which we noted that, in parental termination cases, guardians ad litem are appointed under ORS 419B.875(2), which provides for the appointment of a guardian ad litem when a parent lacks capacity to act on her own behalf. In fact, we noted that the mere appointment of a guardian ad litem "does not mean, of course, that the guardian ad litem `steps into the shoes' of the represented person *754 for all purposes." 188 Or.App. at 598, 72 P.3d 674 (emphasis in original). Rather, it is because of the nature of the purpose of the appointment of a guardian ad litem in such cases that her consent is required. Id.
In this case, as we have noted, petitioner was not appointed a guardian ad litem because of a lack of capacity to stand trial. Accordingly, the reasoning of this court's decision in Sumpter simply does not apply. In fact, in a criminal proceeding, if a defendant is determined not competent, the law requires not the appointment of a guardian ad litem, but the suspension of the proceeding. ORS 161.370(2) ("If the court determines that the defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended[.]"). There is no statutory provision to allow a guardian ad litem to "step into the shoes" of an incompetent criminal defendant and then make decisions on his or her behalf.
We therefore conclude that it was reasonable for Sabitt and Mullen to not request Jurowski's consent to the plea agreement, and that, as a result, the post-conviction court did not err in holding that petitioner was not denied effective assistance of counsel because of their failure to do so. Furthermore, because there was no requirement that petitioner's guardian ad litem approve the plea agreement, the post-conviction court did not err in holding that petitioner was not denied due process when the trial court accepted his guilty pleas without Jurowski's consent.
Affirmed.